James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, PC
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

William C. Wright
THE WRIGHT LAW OFFICE, P.A.
301 Clematis Street, Suite 3000
West Palm Beach, Florida 33401
(561) 514-0904

Brian J. Robbins
Felipe J. Arroyo
Shane P. Sanders
Gina Stassi
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, California 92101
(619) 525-3990

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL HIMMEL, Derivatively on Behalf of CENTRAL EUROPEAN DISTRIBUTION CORPORATION,<br><br>          Plaintiff,<br><br>   v.<br><br>WILLIAM V. CAREY, CHRISTOPHER BIEDERMANN, DAVID BAILEY, MARKUS SIEGER, MAREK E. FORYSIAK, N. SCOTT FINE, ROBERT P. KOCH, and WILLIAM S. SHANAHAN,<br><br>         Defendants,<br><br>   - and -<br><br>CENTRAL EUROPEAN DISTRIBUTION CORPORATION, a Delaware Corporation,<br><br>         Nominal Defendant. | Civil Action No.<br><br><br><br><br><br><br><br>**VERIFIED COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiff, by way of Verified Complaint (the "Complaint") against the Defendants, says:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Central European Distribution Corporation ("CEDC" or the "Company") on behalf of the Company against certain of its officers and directors.  This action seeks to remedy Defendants' violations of law, including breach of fiduciary duties, corporate waste, and unjust enrichment, which have caused and continue to cause substantial damage to the Company.

2.      CEDC operates primarily in the alcohol beverage industry as one of the largest producers of vodka in the world.  The Company produced and distributed approximately 32.7 million nine-liter cases of liquor in 2010.  The primary source for the tremendous demand of the Company's vodka is Russia.  Russia is the largest vodka market in the world and CEDC is the largest vodka producer in Russia.  In addition to Russia, the Company is one of the largest vodka sellers in Poland.  Russia and Poland account for approximately 70% and 28% of the Company's operating profit, respectively.

3.      This matter concerns the widespread mismanagement of the Company and the harm that befell CEDC as a result.  To start, Defendants William V. Carey ("Carey"), the Company's Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors (the "Board"), and Christopher Biedermann ("Biedermann"), the Company's Chief Financial Officer ("CFO"), made numerous improper statements in the second half of 2010 about the Company's future vodka sales in Poland and Russia, statements that would not have been possible without the Board members breaches of the duty of loyalty.  For example, in August 2010, Defendants Carey and Biedermann claimed that the Company's third quarter and full year 2010 financial results would be strong.  Further, Carey stated that the Company was "still realizing strong distribution gains" in the Russian market.  Carey and Biedermann made this claim based on: (i) increasing vodka sales in Russia; and (ii) a clampdown on illegal vodka by the Russian government, which would benefit the

2

Company's Russian sales.  Despite a relatively weak second quarter of 2010 in the Polish market, Carey also claimed the Polish market would continue to be strong because the Company planned to launch a new brand of vodka in Poland in the fourth quarter.

4.      In November 2010, Defendant Carey again claimed the fourth quarter and year end 2010 would be "much brighter" than the Company's previous two quarters.  In particular, Carey claimed that the steps he caused the Company to take – a new product launch and the doubling of the size of the sales force – would "translate[] into positive Q4 top-line growth."  When questioned, Carey brushed aside the Polish slowdown by blaming it on: (i) the accidental death of the Polish president; (ii) subsequent mourning period where alcohol sales were restricted; (iii) massive flooding in parts of the country; and (iv) record high temperatures, all of which were temporary events.

5.      Unbeknownst to the investing public, however, was that the Company was losing significant market share in Russia and Poland.  Russian government officials had shut down the Company's most productive plant in Russia in November 2010.  The Individual Defendants (as defined herein), however, waited four months to disclose this crucial fact.  This is one of the reasons the Company's year-end financial results would be dismal and not meet the stated earnings guidance.

6.      In a press release dated March 1, 2011, CEDC announced its results for the full year 2010.  The Company reported a net loss from continuing operations well below management's guidance.  In particular, comparable earnings per share came in 63% short of management guidance and sales came in 9% below guidance.  Importantly the Company also revealed a $138 million impairment of its most important Polish vodka brands, Bols and Absolwent.

7.      The Company's dismal 2010 financial results are attributable to the Individual Defendants' mismanagement that caused significant declines in the Company's vodka sales in Poland and Russia.  These were not "one-off" declines, but rather, due to the cannibalization of the

Company's own products and a government shutdown of the Company's main production facility in Russia.

8.      On top of bearing responsibility for the cannibalization and shutdown of the Company's Russian plant, the Individual Defendants also caused the Company to present its financial statements in violation of United States Generally Accepted Accounting Principles ("GAAP"), due to failing to timely take impairment charges.  Moreover, the Company's Board and Audit Committee knowingly or recklessly reviewed and approved these improper statements and violations of GAAP.  The Board also knowingly or recklessly caused the Company to have ineffective internal financial and disclosure controls while claiming that they were effective. Analysts responded to the dismal 2010 fiscal year by criticizing the Company's direction and management's candor stating they were "disappointed with the level of management communication" regarding the earnings guidance miss that was nowhere in management's ballpark.

9.      In the wake of the disclosure, CEDC's stock market capitalization plunged more than 37%, or $611.5 million in a single day.  Over the next eight months, the Company's market capitalization would continue to decline by over 79% from its high on December 2, 2010.  Despite this precipitous drop, the Company's market capitalization dropped another 10% when it announced an impairment charge for goodwill and trademarks of $674.5 million because of "sensitivities in its core markets of Poland and Russia."

10.      While the Company's ordinary shareholders, including Plaintiff, suffered due to this drop in value, the Individual Defendants fared much better due to their underserved bonuses and compensation.  Worse, Defendant Carey took advantage of his knowledge about CEDC's true financial health by selling over 67,000 shares of his personally held Company stock for over $1.7 million worth of proceeds.  Further, as a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit filed in the United States

District Court for the District of New Jersey on behalf of investors who purchased CEDC's shares between August 5, 2010 and February 28, 2011.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) CEDC maintains its principal place of business in the District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to CEDC occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

14.     Plaintiff Daniel Himmel was a shareholder of CEDC at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current CEDC shareholder.  Plaintiff is a citizen of Florida.

15.     Nominal Defendant CEDC is a Delaware corporation with principal executive offices located at 3000 Atrium Way, Suite 265, Mount Laurel, New Jersey. CEDC is one of the largest vodka producers in the world and the largest integrated spirit beverages business in Central and Eastern Europe. CEDC maintains leading positions in Poland, Russia, and Hungary through its brand portfolio, which includes BOLS, Zubrowka, Absolwent, Palace, Soplica, Green Mark, Parliament, Zhuravli, and Royal vodka brands.

16.     Defendant Carey is CEDC's Chairman of the Board, President, and CEO and has been since 1997. Carey joined Carey Agri, a CEDC subsidiary, in 1990. Carey is named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Carey knowingly, recklessly, or with gross negligence made improper statements or failed to disclose material information in the Company's press releases, public filings, and in investor conference calls concerning the Company's: (i) financial condition; (ii) earnings guidance; (iii) the effectiveness of its internal financial controls; and (iv) that the Company's largest Russian production facility shutdown for two weeks. While in possession of material, non-public information concerning CEDC's true business health, Carey sold 67,300 shares of his stock for $1,725,585.91 in proceeds. CEDC paid Carey the following compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|------|--------|---------------|------------------------|-------|
| 2010 | $676,307 | $801,040 | $229,649 | $1,706,996 |

Carey is a citizen of Poland.

17.     Defendant Biedermann is CEDC's CFO and has been since January 2005 and a Vice President and has been since at least August 2005. Biedermann is named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Biedermann knowingly, recklessly, or with gross negligence made improper statements or

failed to disclose material information in the Company's press releases, public filings, and in investor conference calls concerning the Company's: (i) financial condition; (ii) earnings guidance; (iii) the effectiveness of its internal financial controls; and (iv) that the Company's largest Russian production facility shutdown for two weeks.  CEDC paid Biedermann the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2010 | $354,955 | $378,819 | $18,115 | $751,889 |

Biederman is a citizen of Poland.

18.    Defendant David Bailey ("Bailey") is CEDC's Lead Director and has been since March 2008 and a director and has been since December 2003.  Bailey was also Chairman of CEDC's Audit Committee from at least April 2010 to at least April 2011.  As a member of the Audit Committee and a director, Bailey knowingly or recklessly: (i) reviewed and approved improper earnings guidance and financial statements; (ii) reviewed and approved ineffective internal controls over financial reporting; and (iii) failed to disclose that the Company's largest Russian production facility shutdown for two weeks.  CEDC paid Bailey the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Equity Incentive Plan Awards: | Total |
|-------------|-------------------|---------------|-------------------------------|-------|
| 2010 | $61,000 | $241,150 | $77,240 | $379,390 |

Bailey is a citizen of Poland.

19.    Defendant Markus Sieger ("Sieger") is a CEDC director and has been since August 2005.  Sieger was also a member of CEDC's Audit Committee in at least April 2011.  As a member of the Audit Committee and a director, Sieger knowingly or recklessly: (i) reviewed and approved improper earnings guidance and financial statements; (ii) reviewed and approved ineffective internal controls over financial reporting; and (iii) failed to disclose that the Company's largest Russian

production facility shutdown for two weeks.  CEDC paid Sieger the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Equity Incentive Plan Awards: | Total |
|---|---|---|---|---|
| 2010 | $46,000 | $115,800 | $89,150 | $250,950 |

Sieger is a citizen of Switzerland.

20.     Defendant Marek E. Forysiak ("Forysiak") is a CEDC director and has been since April 2009.  Forysiak was also a member of CEDC's Audit Committee from at least April 2010 to at least April 2011.  As a member of the Audit Committee and a director, Forysiak knowingly or recklessly: (i) reviewed and approved improper earnings guidance and financial statements; (ii) reviewed and approved ineffective internal controls over financial reporting; and (iii) failed to disclose that the Company's largest Russian production facility shutdown for two weeks.  CEDC paid Forysiak the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Equity Incentive Plan Awards: | Total |
|---|---|---|---|---|
| 2010 | $36,000 | $125,450 | $59,445 | $220,895 |

Forysiak is a citizen of New Jersey.

21.     Defendant N. Scott Fine ("Fine") is a CEDC director and has been since January 2003.  Fine was also a CEDC director in 2001.  Fine knowingly or recklessly: (i) reviewed and approved improper earnings guidance and financial statements; (ii) reviewed and approved ineffective internal controls over financial reporting; and (iii) failed to disclose that the Company's largest Russian production facility shutdown for two weeks.  CEDC paid Fine the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2010 | $30,000 | $149,575 | $179,575 |

Fine is a citizen of Connecticut.

22.    Defendant Robert P. Koch ("Koch") is a CEDC director and has been since February 2004.  As a director, Koch knowingly or recklessly caused and allowed and failed to correct improper statements regarding: (i) improper earnings guidance and financial statements; (ii) ineffective internal controls over financial reporting; and (iii) failed to disclose that the Company's largest Russian production facility shutdown for two weeks.  CEDC paid Koch the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2010 | $30,000 | $144,750 | $174,750 |

Koch is a citizen of Maryland.

23.    Defendant William S. Shanahan ("Shanahan") is a CEDC director and has been since April 2010.  Defendant Shanahan knowingly or recklessly caused and allowed and failed to correct improper statements regarding: (i) improper earnings guidance and financial statements; (ii) ineffective internal controls over financial reporting; and (iii) failed to disclose that the Company's largest Russian production facility shutdown for two weeks.  CEDC paid Shanahan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Equity Incentive Plan Awards: | Total |
|---|---|---|---|---|
| 2010 | $20,000 | $48,250 | $65,365 | $133,615 |

Shanahan is a citizen of Connecticut.

24.    The Defendants identified in ¶¶16-17 are referred to herein as the "Officer Defendants."  The Defendants identified in ¶¶16, 18-23 are referred to herein as the "Director Defendants."  The Defendants identified in ¶¶18-20 are referred to herein as the "Audit Committee Defendants."  The Defendants identified in ¶¶16-23 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers, directors, and/or fiduciaries of CEDC and because of their ability to control the business and corporate affairs of CEDC, the Individual Defendants owed CEDC fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to oversee, control, and manage CEDC in a fair, just, honest, diligent, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of CEDC so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26.     Each officer and director of the Company owes to CEDC the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate all material information, in an accurate and truthful manner.

**Audit Committee Duties**

27.     In addition to their general duties, Defendants Bailey, Forysiak, and Sieger owe and/or owed specific duties as members of the Audit Committee.  In particular, under the Audit Committee Charter in effect since March 14, 2007, the Audit Committee members were responsible for overseeing the system of internal controls and procedures for financial reporting and the integrity of CEDC's financial reporting process.  Thus, they were also responsible for reviewing and approving critical accounting policies, including impairment charges.  The Audit Committee's duty to comply with financial statements not only applied to United States policies and Generally Accepted Accounting Principles ("GAAP"), but also for compliance with policies "in Poland or any other country where CDEC conducts its operations."  In addition, the Audit Committee is required to

make sure the Company is complying with applicable legal and ethical guidelines throughout the Company. During 2010, the Audit Committee met 14 times.

**Code of Conduct**

28. In addition to their general duties, Defendants Carey, Biedermann, Bailey, Fine, Koch, Forysiak, Shanahan, and Sieger owe and owed specific duties under the CEDC Code of Conduct (the "Code"). In particular, under the Code, the Individual Defendants are required to comply with applicable laws and government regulations. The Code also prohibits the Individual Defendants from illegally trading the Company's securities while in possession of material, non-public information about the Company. Like the Audit Committee Charter, the Code also requires the Company's books and financial records to accurately reflect the Company's business operations.

**Control, Access, and Authority**

29. The Individual Defendants, because of their positions of control and authority as directors and/or officers of CEDC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30. Because of their advisory, executive, managerial, and directorial positions with CEDC, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of CEDC.

31. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CEDC, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

32. To discharge their duties, the officers and directors of CEDC were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the financial affairs of the Company.  By virtue of such duties, the officers and directors of CEDC were required to, among other things:

(a)    properly, fairly, and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including the Company's compliance with applicable, laws, rules, and regulations;

(b)    remain informed as to how CEDC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(c)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(d)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)    refrain from acting upon material, non-public corporate information; and

(f)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority.

**Breaches of Duties**

33.    Each Individual Defendant, by virtue of his position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of CEDC, the absence of good faith on their part, and a reckless

disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of CEDC's Board.

34. The Individual Defendants breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to issue improper statements regarding the Company's earnings guidance, internal controls, and business prospects. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of federal securities laws. As a result, CEDC has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of CEDC, regarding the Individual Defendants' management of CEDC's operations, earnings guidance, declining market share, plant shutdown in Russia, and necessary impairment charges; (ii) facilitate Defendant Carey's illicit sale of over $1.7 million of his personally held shares while in possession of material, non-public information; and (iii) enhance the Individual Defendants' executive and directorial positions at CEDC and the profits, power, and

prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

37.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused or allowed the Company to engage in improper and illegal business practices.

38.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

39.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in improper business practices. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

41.    Defendant CEDC operates primarily in the alcohol beverage industry as one of the largest producers of vodka in the world. CEDC is Central and Eastern Europe's largest integrated spirit beverages company as measured by total volume. CEDC is the largest vodka producer in Russia, the world's largest vodka market. CEDC's Green Mark brand is the top-selling mainstream

vodka in Russia and the second-largest vodka brand by volume in the world.   In addition, the Company's Parliament and Zhuravli brands are two top-selling sub-premium vodkas in Russia. Also, CEDC is one of the largest vodka producers in Poland with a portfolio that includes Absolwent, Zubrowka, Bols, Palace, and Soplica brands, each of which is produced at CEDC's Polish distilleries.  The Company's Russian and Polish sales account for more than 95% of the Company's sales.

### IMPROPER STATEMENTS

42.     The Individual Defendants breached their fiduciary duties by causing and allowing the Company to issue improper public statements that did not accurately portray CEDC's business prospects in light of the changing vodka and distilled spirit markets.  In addition, the statements improperly portrayed the Company's internal financial and disclosure controls as effective when they were nothing of the sort.

43.     The improper statements began on August 5, 2010. On that day, the Company issued a press release detailing its financial results for the second quarter of the 2010 fiscal year.  For the quarter, the Company reported net sales of $175.6 million as compared to $175.9 million for the same period in the prior year, operating profit of $44.7 million, as compared to $36.3 million for 2009, and net income of $17.6 million, as compared to $16.2 million for the same period in the prior year.  The press release contained improper statements by Defendant Carey, such as "that [the Company] ha[s] started to see more robust demand from the consumer in our largest market."  In particular, the press release stated:

> **We have started to see more robust demand from the consumer in our largest market, Russia** (which represents approximately 75% of our net income), our volumes were up 7.5% from vodka and imports from the Whitehall Group were up 14% in volume terms during the second quarter of 2010. The bulk of the growth in demand for our vodka portfolio is still coming from a lower price point as compared to the second quarter 2009, but pricing seems to have stabilized and gross margins remain above 50% . We have also seen strong Parliament Vodka distribution gains,

post integration, in the second quarter with Parliament [V]odka up 14% in volume. *There has been continued strong interest from the vodka consumer in Russia for our new mainstream/economy brands that we launched last fall, and we are still realizing strong distribution gains for these brands over the last nine months*. Our core economy brand, Yamskaya, is ranked as one of the fastest growing brands in Russia today and is expected to achieve over three million nine liter cases in 2010 (a 25% increase over 2009). Although the product mix has had a slight negative impact on our gross margin percentages this has been more than offset by a declining SG&A base resulting in our core operating profit as a percent of sales in Russia expanding by over 400 basis points over 2009 second quarter results.

44.     As to the Russian government's control over vodka, Defendant Carey praised the government for its crackdown on the illegal vodka market and its enforcement role.  Carey claimed that the government's crackdown would benefit CEDC's sales in Russia because the consumer of grey market vodka would turn to CEDC's "value sector" or "sub-premium" vodkas.  In particular, Carey stated.

*In Russia the overall vodka market has been positively impacted by strong government controls that have been put in to reduce the grey market*. The controls that are taking place affect the producers of raw spirit, vodka manufacturers, retailers and wholesalers. *We are still estimating that from the shift from grey market to legal market that the overall legal vodka market will grow this year with overall consumption including the grey market down approximately one to three percent*. Based upon Gosstat data, the legal vodka market is up one percent for the six months ending June 30, 2010. We expect that the growth of the legal vodka market to [sic] come primarily from the value sector where people are shifting from the grey market, but *as real wage inflation continues its positive trends we expect mainstream/sub-premium sectors to benefit medium term*.

45.     As to the Company's second largest market, Poland, Defendant Carey stated that while the Company's sales were hit by "one-off" consumer issues that pushed sales and margins down, the Company would see "continued improvement" in its market share and sales in Poland.  In pursuit of this continued improvement in Poland, Carey informed the investing public that the Company would be doing a "major launch" of its Zubrowka Biala brand of Vodka in Poland in the fourth quarter.  In turn, the Carey improperly stated that "we are on track to deliver increased top line growth and a continued improvement in our operating profit margins."  Carey also stated:

The Polish consumer was hit with a number of external events that we believe had a significant impact on the Polish vodka market generally and our results. The quarter began with the tragic accident involving the death of the Polish President and other high ranking officials followed by a few weeks of mourning, massive flooding took place in the southern part of Poland and record high temperatures that began in June. Our vodka volumes for the quarter were down approximately 12% and were partially offset by increases in our import and export businesses. We were able to continue to reduce SG&A as a percent of sales on a comparable basis by over 100 basis points, translating into operating profit margins of over 50 basis points higher as compared to the prior year period. *Management is extremely focused on improving the volume numbers in Poland and with a major launch of a new mainstream/subpremium vodka brand planned for the fourth quarter of this year and improved execution; we believe we are on track to deliver increased top line growth and a continued improvement in our operating profit margins.*

46.     Defendant Biedermann also provided financial guidance for the Company's 2010 fiscal year.  In particular, Biedermann updated the full year net sales guidance from $900-$1,050 million to $764-$914 million while *keeping full year fully diluted earnings per share ("EPS") guidance unchanged at $2.10-$2.20 per share*.  He also noted that the Company was maintaining its full year guidance for operating profit, excluding depreciation of $262 million.

47.     On August 6, 2011, Defendants Carey and Biedermann held a conference call for analysts and investors to discuss the Company's earnings release and operations.  During the call, Carey and Biedermann spoke positively about the Company's businesses and prospects.   In particular, Defendant Carey stated that the Company was not losing market share in Poland:

> **Michal Potyra -** *CAIB - Analyst*
>
> Okay. Thank you. And can you -- can you tell me what is your estimate of market decline in Poland in 2Q. Overall vodka market.
>
> **William Carey -** *Central European Distribution - President, CEO, Chairman*
>
> We think it was -- it was around 10% down.
>
> **Michal Potyra -** *CAIB - Analyst*
>
> And you think that, that was losing market share and Poland was gaining, or more -- more or less all the players were moving in line with the market?

**William Carey -** *Central European Distribution - President, CEO, Chairman*

*We didn't see a big move in the Q2 of the different market shares. To be honest. There wasn't a big move between month on market share.*

48.     Four days later, on August 9, 2010, the Company filed its Form 10-Q for the second fiscal quarter of 2010 with the U.S. Securities and Exchange Commission ("SEC"). Defendants Carey and Biedermann certified to the truthfulness and accuracy of the Form 10-Q pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). The Audit Committee reviewed and approved the Form 10-Q, which improperly claimed the Company's internal financial and disclosure controls were effective. In particular, the Form 10-Q stated: "[b]ased upon the evaluation of the Company's disclosure controls and procedures as of the end of the period covered by this report, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's *disclosure controls and procedures were effective at the reasonable assurance level*."

49.     On November 5, 2010, CEDC announced its results for the third quarter of 2010. Once again, the results were lackluster, but Defendants continued their improper statements by assuring the market that the future was much "brighter." Moreover, the disappointing quarter was once again due to "one-off events." The Individual Defendants continue to conceal the Company's true business prospects. Indeed, Defendant Carey claimed that the Company's "biggest quarter of the year in terms of revenue and profitability" was approaching next quarter. In addition, Carey claimed that the November launch of CEDC's Zubrowka Biala brand in the Polish market would provide a solid quarter and year.

50.     In the release, Defendant Carey commented on the quarter's results stating:

*We were disappointed by the results in the 3rd quarter of 2010 which were a result of a combination of factors including external events, currency movements, commodity prices and negative sales mix that occurred in our core markets.* After seeing solid volume growth coming from the 2nd quarter of 2010, we were expecting a continuation of these positive volume trends into the 3rd quarter. The expected positive trends from the 2nd quarter were heavily impacted by the record heat wave

across Eastern Europe and fires which spread across key parts of Russia. These factors resulted in an estimated reduction in the vodka market in volume terms during this period by an estimated 6%-8% in Poland and 12%-15% in Russia as compared to the prior year. We were able to see strong volume and market trends in September; however, these trends were not sufficient to cover the shortfall for the first two months of the quarter.

. . . We have spent a lot of management time on restructuring, integration and cost reductions over the past fifteen months which have all contributed to the lowering of our operating overheads. The key objective for management on all levels is top line growth from our existing core portfolio, as well as new product development and new import agency business. *This will be our primary focus over the next 24 months; kicking off next week with our biggest ever new product launch in Poland. In Russia, we have a pipeline of new products that will begin to enter the market early next year, not to mention our successful brandy launch last month*. Our strategic aim is to grow profitable market share in Poland, Russia and Hungary through all segments.

. . . *Over the last six months, we have seen continued improvement in consumer demand and sentiment in Russia as well as a positive outlook from a macro view in Russia*. The imported market for wines and spirits in Russia is benefitting the most from these trends, with our year to date sales in Whitehall up over 15% year on year. This trend has also been confirmed by many multinational spirit companies who have reported strong brown spirit sales coming out of the Russian market. We believe these trends of strong imported wine and spirit sales in Russia will continue dynamically for the next few years. As stated last quarter, we are continuing the negotiation for an early buy out and controlling stake in the Whitehall Company which we anticipate could close in the near future.

. . . *As we are now in our biggest quarter of the year in terms of revenue and profitability we are forecasting high single digit volume growth and double digit value growth (taking into account recent price increases) for this quarter from our overall portfolio*. We have seen a stabilization of commodity prices since September, and we believe we will continue to benefit from a much lower cost base this quarter and beyond. Although the 3rd quarter was a huge disappointment for us, *our management team is extremely focused on delivering on these 4th quarter objectives, and we believe the worst is behind us*.

51.     The release concluded with CEDC announcing that it had updated its full year 2010 net sales guidance from $764-$914 million to $730-$780 million and its full year comparable fully-diluted EPS guidance from $2.10-$2.20 to $1.50-$1.70.  This revised guidance included exchange rates assumptions based upon recent market rates.  While the press release played down the lowered guidance, the true state of the Company was much worse than what was being disclosed.

52.     That same day, CEDC held a conference call for analysts and investors to discuss the Company's earnings release and operations.  During the call, Defendant Carey, while recognizing that they were "extremely disappointed on the results in Q3," spoke positively about the Company's businesses and prospects, stating, "certainly the opportunity in front of us is much more bright than what we've seen in the past three quarters."  Carey emphasized that the steps they had taken - a new product launch, the doubling of the size of the sales force in terms of the development teams - "translates into positive Q4 top-line growth."  Moreover, the Individual Defendants "[n]ow moving [into] Q4, [were] anticipating certainly no more one-off events" because they were "anticipating a strong growth of [CEDC's] imports and exports, and also with the new product launch next week, [would be its] biggest product launch ever [it has] made as a Company, in terms of [its] Zubrowka [Biala]."  Thus the Individual Defendants were "very, very positive" and "should see obviously positive results coming out of this development sales force, and overall [were] seeing the consumer fairly stable … translat[ing] into positive Q4 top-line growth, which is quite a bit different than a 16% drop in Q3."

53.     On November 9, 2010, CEDC filed with the SEC its Form 10-Q for the quarter ended September 30, 2010, which was signed pursuant to SOX by Defendants Carey and Biedermann.  The Audit Committee reviewed and approved the Form 10-Q, which improperly claimed the Company's internal financial and disclosure controls were effective.  In particular, the Form 10-Q stated: "[b]ased upon the evaluation of the Company's disclosure controls and procedures as of the end of the period covered by this report, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective at the reasonable assurance level."

## REASONS THE STATEMENTS WERE IMPROPER

54.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     CEDC had double digit declines in its vodka portfolio and its loss of market share in Poland was growing steeper as rivals gained market share due to the Company's pricing discounts and advertising;

(b)     CEDC's new vodka brand cannibalized its established brands;

(c)     CEDC needed to take an impairment charge because of its eroding Polish vodka market share and the release of Zubrowka Biala in the Polish market;

(d)     the launch of the new product, Zubrowka Biala, with significant market spending in the form of rebates, was having a materially adverse effect on gross margin and impacted the channel mix in the market; and

(e)     the Company had shut down a major production facility for two weeks during the Company's busiest time of year because it was unable to appropriately pay Russian excise taxes.

## THE TRUTH EMERGES

55.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge when the Company reported its fiscal 2010 financial results on March 1, 2011.  A mere five months after Defendant Carey claimed that the Company's "certainly the opportunity in front of us is much more bright than what we've seen in the past three quarters," CEDC announced its results for the full year 2010 in a press release.  The announcement reported *a net loss from continuing operations* on a U.S. GAAP basis for the year of $92.9 million, or $1.32 per fully diluted share, as compared to a net profit of $72.7 million, or $1.35 per fully diluted share,

for the same period in 2009. The Company reported net income from continuing operations of $38.7 million, or $0.55 per fully diluted share, for the full year 2010, as compared to $118.9 million, or $2.20 per fully diluted share, for the same period in 2009 **and previous guidance of EPS from $2.10-$2.20 to $1.50-$1.70**. The loss was due in part to a $152 million impairment charge, largely related to the Company's Absolwent and Bols brands in Poland. The impairment charge was necessary, but improperly delayed, because the Company had lost market share in Poland and the Company's new vodka brand was cannibalizing its established Polish brands.

56.     Following the full year earnings announcement, Defendants Carey and Biedermann held a conference call with analysts and investors, wherein Defendants disclosed for the first time that its main vodka production facility in Russia had closed for two weeks **in November**. Carey and Biedermann stated that the Russian government officials shut down the plant because the Company had an excise tax issue. Russian excise taxes are levied on manufacturers of raw and refined alcohol. The Russian tax code specifies strict licensing rules on alcohol distillers. The Individual Defendants disclosed they had a dispute with authorities on an old excise tax issue, which resulted in the loss of two weeks of limited production runs, with one week having nothing produced in the middle of November, their "key selling period." Defendants admitted that this had "hit our bottom line quite dramatically as we had to give extra discounts in the marketplace and a bit [of] extra credit days to make up for some of those [sic] lost period of time that we were affected." As a result, the Company had to take a $35 million charge for the production issue. Thus, the Individual Defendants failed to have adequate internal controls in place to be prepared for the Russian excise tax issues. Even worse, the Individual Defendants waited four months to disclose the shutdown of the Company's busiest production facility at the busiest time of year.

57.     Additionally, during this conference call, Defendant Carey admitted the Company had double digit declines in their vodka portfolio. Carey provided two reasons for the double digit

decline.  First, the Company's competitors in key accounts had taken the market share.  Second, the launch of Zubrowka Biala did not positively impact the bottom line the way Defendants represented. Rather, Carey stated that it had "a negative implication on our bottom line, as the brand grew 2.5 times more than we estimated, and as we put out the promotional plan in place [sic], we couldn't just turn off the spigot or reduce the plan as the brand was doing extremely well . . . it was running a negative comp.  Certainly, also, it does cannibalize - the growth in this brand, *it does cannibalize about 30% to 35% of our other portfolio*."  Thus, the Individual Defendants failed to disclose that their own product was so significantly discounted and profit margins were so low that it cannibalized its other products in Poland, eating away at its own market share and profits.  All of this resulted in a $131 million non-cash impairment charge because the fair value of the trademarks related to the Absolwent and Bols brands in Poland had deteriorated.

58.     In response to the abysmal earnings announcement, analysts that cover the Company roundly criticized management.  In particular, Brady Martin, an analyst with Citigroup Global Markets stated that "[w]hile 4Q10 was a disappointment, we believe the FY11 guidance is even more so."  Continuing, Mr. Martin stated that the Company's 2011 fiscal year earnings per share "guidance of $1.05-$1.25/share *implies 4Q10 weakness was not entirely due to one offs*."  Thus, the guidance miss were due to more "structural issues."  Mark Olson, an analyst with RBS Global Banking & Markets questioned management's candor, including stating that the shutdown of the Russian plant during peak season should have been disclosed when it happened in November, not over four months later.  In particular, Mr. Olson stated the shutdown "prohibited the plant from being able to produce vodka during the peak production season.  *This news was not circulated to the market yet was a key item noted in the annual results and we feel that this should have been properly communicated especially given they just raised a further EUR50m in the debt markets in early December*."

59.     In a UniCredit analyst report titled "Growth at Any Price Caused a Painful Hangover" the analyst discussed how the Company's declining market share caused it to increase spending on advertising and promotion, but that it "proved very costly, wiping out most of the margin in Poland. In our view, *the execution and communication of such a significant change in strategy was far from perfect*...."

60.     On this news, CEDC'S market capitalization plunged, erasing almost $611.5 million, or 37%, in market capitalization in a single day.  The Company's market capitalization declined from a high of $1.9 billion on December 2, 2010 to $392.7 million on November 1, 2011, a decline over $1.5 billion, or 80%.

61.     As a result of the Individual Defendants poor stewardship, the Company has become an acquisition target for Russian business interests linked to state controlled entities.  This threatens to lead to an acquisition of the Company at a depressed stock price due to the Individual Defendants' poor management.  An acquisition by state controlled entities would not maximize shareholder value.  Indeed, a Renaissance Capital analyst stated "[c]orporate governance risks should not be underestimated.  We do not exclude the risk of government involvement in getting CEDC under Rosspirtprom control, but details are scarce to make a more accurate judgment.  The future of CEDC's Polish assets is also unclear. CEDC, owing to its poor operating management, is facing the risk of bankruptcy on $1.3bn debt, 30% of which matures in 2013. It [sic] that the card that an acquirer may play? We do not exclude this possibility."

62.     Most recently, on November 4, 2011, the Company announced that it had an operating loss of $645.2 million for its third quarter of fiscal 2011 due to "an impairment charge for goodwill and trademarks of $674.5 million."  In particular, the Company wrote down $128 million of their Polish Bols brand of vodka because "since we've launched the group of Biala brand last year, *we've seen our Bols brand cannibalized in volume*. So the volume of Bols has been taken up

by sales by some of our other brands, particularly Zubrowka Biala, thus leading to an impairment charge for that brand."

## INSIDER SALES BY DEFENDANT CAREY

63.    Rather than providing the market with correct information, Defendant Carey used his knowledge of CEDC's material, non-public information to sell his personal holdings while the Company's stock was artificially inflated.  As an officer and director of CEDC, Carey was privy to material, non-public information about the Company's true business health.

64.    While in possession of this knowledge, Defendant Carey sold 67,300 shares of his personally held CEDC stock for proceeds of $1,725,585.91.  Carey's sales were timed to maximize profit from CEDC's then artificially inflated stock price.  Carey's sales are suspicious given that his stock sales were timed within one week of the relevant period high stock price on December 2, 2010 of $27.44, which is only $1.80 more than Carey's weighted average sale price of $25.64.  The sales' timing are suspicious given that Carey knew about the Company's Russian excise tax issue and plant shutdown, but the market did not.

65.    In sum, Defendant Carey sold over $1.7 million worth of stock was sold at artificially inflated prices as detailed by the chart below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
| --- | --- | --- | --- | --- |
| CAREY | 12/9/2010 | 300 | $25.58 | $7,674.00 |
| | 12/9/2010 | 300 | $25.58 | $7,674.51 |
| | 12/9/2010 | 400 | $25.58 | $10,233.00 |
| | 12/9/2010 | 500 | $25.58 | $12,791.50 |
| | 12/9/2010 | 5,289 | $25.59 | $135,319.07 |
| | 12/9/2010 | 600 | $25.59 | $15,351.24 |
| | 12/9/2010 | 500 | $25.59 | $12,792.75 |
| | 12/9/2010 | 800 | $28.59 | $22,868.48 |
| | 12/9/2010 | 300 | $25.59 | $7,675.74 |
| | 12/9/2010 | 500 | $25.59 | $12,793.00 |
| | 12/9/2010 | 399 | $25.59 | $10,208.93 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 12/9/2010 | 79 | $25.59 | $2,021.41 |
| | 12/9/2010 | 400 | $25.59 | $10,236.00 |
| | 12/9/2010 | 400 | $25.60 | $10,240.00 |
| | 12/9/2010 | 300 | $25.60 | $7,681.26 |
| | 12/9/2010 | 300 | $25.61 | $7,681.50 |
| | 12/9/2010 | 300 | $25.61 | $7,682.25 |
| | 12/9/2010 | 846 | $25.61 | $21,665.55 |
| | 12/9/2010 | 100 | $25.61 | $2,561.00 |
| | 12/9/2010 | 2,400 | $25.61 | $61,474.08 |
| | 12/9/2010 | 330 | $25.65 | $8,462.85 |
| | 12/9/2010 | 1,200 | $25.68 | $30,813.00 |
| | 12/9/2010 | 400 | $25.69 | $10,274.00 |
| | 12/9/2010 | 2,957 | $25.70 | $75,994.90 |
| | 12/9/2010 | 600 | $25.70 | $15,421.98 |
| | 12/9/2010 | 1,000 | $25.70 | $25,703.80 |
| | 12/9/2010 | 2,900 | $25.71 | $74,544.50 |
| | 12/9/2010 | 400 | $25.71 | $10,284.00 |
| | 12/10/2010 | 97 | $25.25 | $2,448.77 |
| | 12/10/2010 | 1,303 | $25.27 | $32,925.77 |
| | 12/10/2010 | 100 | $25.27 | $2,527.00 |
| | 12/10/2010 | 93 | $25.28 | $2,350.58 |
| | 12/10/2010 | 2,707 | $25.28 | $68,432.96 |
| | 12/10/2010 | 100 | $25.29 | $2,529.00 |
| | 12/10/2010 | 200 | $25.30 | $5,060.50 |
| | 12/10/2010 | 2,200 | $25.31 | $55,687.94 |
| | 12/10/2010 | 400 | $25.32 | $10,128.00 |
| | 12/10/2010 | 1,000 | $25.33 | $25,330.00 |
| | 12/10/2010 | 916 | $25.35 | $23,220.60 |
| | 12/10/2010 | 400 | $25.38 | $10,150.00 |
| | 12/10/2010 | 291 | $25.38 | $7,385.09 |
| | 12/10/2010 | 1,000 | $25.39 | $25,390.00 |
| | 12/10/2010 | 3,500 | $25.41 | $88,935.00 |
| | 12/10/2010 | 100 | $25.42 | $2,541.50 |
| | 12/10/2010 | 400 | $25.42 | $10,166.52 |
| | 12/10/2010 | 100 | $25.43 | $2,542.50 |
| | 12/10/2010 | 2,500 | $25.44 | $63,611.00 |
| | 12/10/2010 | 1,000 | $25.45 | $25,450.00 |
| | 12/10/2010 | 700 | $25.47 | $17,827.53 |
| | 12/10/2010 | 100 | $25.47 | $2,547.00 |
| | 12/10/2010 | 1,300 | $25.50 | $33,150.00 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 12/10/2010 | 600 | $25.50 | $15,301.98 |
| | 12/10/2010 | 2 | $25.51 | $51.01 |
| | 12/10/2010 | 305 | $25.59 | $7,804.98 |
| | 12/10/2010 | 679 | $25.60 | $17,382.40 |
| | 12/10/2010 | 400 | $25.64 | $10,256.52 |
| | 12/10/2010 | 7 | $25.65 | $179.55 |
| | 12/13/2010 | 115 | $25.65 | $2,949.75 |
| | 12/13/2010 | 1,785 | $25.66 | $45,799.71 |
| | 12/13/2010 | 197 | $25.69 | $5,061.42 |
| | 12/13/2010 | 3,100 | $25.70 | $79,654.50 |
| | 12/13/2010 | 403 | $25.70 | $10,355.33 |
| | 12/13/2010 | 1,000 | $25.70 | $25,700.00 |
| | 12/13/2010 | 100 | $25.71 | $2,571.00 |
| | 12/13/2010 | 4,400 | $25.71 | $113,127.52 |
| | 12/13/2010 | 600 | $25.74 | $15,442.50 |
| | 12/13/2010 | 1,000 | $25.80 | $25,800.00 |
| | 12/13/2010 | 800 | $25.86 | $20,688.00 |
| | 12/13/2010 | 2,000 | $25.90 | $51,800.00 |
| | 12/13/2010 | 1,400 | $25.92 | $36,288.00 |
| | 12/13/2010 | 1,000 | $26.08 | $26,080.70 |
| | 12/13/2010 | 1,000 | $26.09 | $26,087.50 |
| | 12/13/2010 | 100 | $26.12 | $2,612.00 |
| | 12/13/2010 | 1,000 | $26.13 | $26,130.00 |
| | | | | |
| **TOTAL** | | **67,300** | | **$1,725,585.91** |

## DAMAGES TO CEDC

66.     As a result of the Individual Defendants' improprieties, CEDC disseminated improper, public statements concerning its earnings guidance and its business prospects.  These improper statements have devastated CEDC's credibility as reflected by the Company's almost $1.5 billion million, or 80%, market capitalization loss.

67.     Further, as a direct and proximate result of the Individual Defendants' actions, CEDC has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

27

(a)     costs incurred from defending and paying any settlement in the class action for violations of federal securities laws;

(b)     costs incurred from correcting the Company's ineffective internal financial and disclosure controls;

(c)     lost profits due to shutdown of the Russian production facility because of a failure to handle the Russian excise tax issues;

(d)     lost profits as a result of the Company's Zubrowka Biala brand cannibalizing Absolwent and Bols, its established Polish vodka brands;

(e)     lost value of the Company's goodwill; and

(f)     costs incurred from compensation and benefits paid to the Defendants who have breached their duties to CEDC.

68.     Moreover, these actions have irreparably damaged CEDC's corporate image and goodwill.  For at least the foreseeable future, CEDC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that CEDC's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.     Plaintiff brings this action derivatively in the right and for the benefit of CEDC to redress injuries suffered, and to be suffered, by CEDC as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  CEDC is named as a nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70.     Plaintiff will adequately and fairly represent the interests of CEDC in enforcing and prosecuting its rights.

71.     Plaintiff was a shareholder of CEDC at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current CEDC shareholder.

72.     The current Board of CEDC consists of the following seven individuals: Defendants Carey, Bailey, Fine, Koch, Sieger, Forysiak, and Shanahan.  Plaintiff has not made any demand on the Board because such a demand would be a futile and useless act, particularly for the reasons stated below.

**Demand Is Excused Because Defendants Carey, Bailey, Fine, Koch, Sieger, Forysiak, and Shanahan Face a Substantial Likelihood of Liability for Their Misconduct**

73.     As alleged above, Defendant Carey breached his fiduciary duty of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's earnings guidance, market share growth, plant shutdown in Russia, and impairment charges.

74.     Defendant Carey also sold CEDC stock under highly suspicious circumstances. Carey as CEO and a director, possessed material, non-public Company information and used that information to benefit himself.  Carey sold stock based on this knowledge of material, non-public Company information regarding the Company's business prospects and fiscal 2010 financial results and the impending decrease in the value of his holdings of CEDC.  Indeed, the timing of the sale of Carey's stock is suspicious given it was within a week of the Company's market capitalization high for all of 2010.  Accordingly, Defendant Carey faces a substantial likelihood of liability for breach of his fiduciary duty of loyalty.  Any demand upon Defendant Carey is futile

75.     Any suit by the current directors of CEDC to remedy these wrongs would expose Defendant Carey and CEDC to liability for violations of the federal securities laws in the pending consolidated securities class action, and would result in civil actions being filed against one or more of the other Individual Defendants.  The securities class action alleges violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right

of action against Carey in this action, then CEDC's efforts would compromise its defense of the securities class action.  Accordingly, demand on the Board is excused.

76.     The principal professional occupation of Defendant Carey is his employment with CEDC, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.   Accordingly, Defendant Carey lacks independence from Bailey, Fine, Koch, Sieger, Forysiak, and Shanahan due to his interest in maintaining his executive position at CEDC.  This lack of independence renders Carey incapable of impartially considering a demand to commence and vigorously prosecute this action.  CEDC paid Carey the following compensation:

| Year | Salary | Option Awards | All Other Compensation | Total |
|------|--------|---------------|------------------------|-------|
| 2010 | $676,307 | $801,040 | $229,649 | $1,706,996 |

Accordingly, Defendant Carey is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.  Demand is futile as to Carey.

77.     Defendants Bailey, Forysiak, and Sieger, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Bailey, Forysiak, and Sieger also were ultimately responsible for the review and approval of the Company's internal financial and disclosure controls

and policies.  The Company's internal financial and disclosure controls were significantly lacking as demonstrated by the Company's improper earnings guidance and impairment charge.

78.     The Audit Committee was also charged with making sure the Company complied with GAAP.  However, the Company violated GAAP by failing to timely take an impairment charge due the impairments in the Company's established Absolwent and Bols Polish brands of vodka.  The Audit Committee knew or was reckless in not knowing the Company's Zubrowka Biala brand vodka was coming to market for months and that an impairment was necessary because the market and promotional push for Zubrowka Biala would cannibalize Absolwent and Bols and impair their value on the Company's books.  This ultimately led to an impairment charge that forced a write down of hundreds of millions of dollars in the Company's goodwill.  Thus, the Audit Committee failed to comply with GAAP and failed to have adequate internal financial controls.

79.     Finally, the Audit Committee Charter also requires the Audit Committee to comply with financial statements regulations in the U.S., but also for compliance with policies "in Poland or any other country where CDEC conducts its operations."  Thus, the Audit Committee was required to review and approve internal controls related to the Russian tax code.  However, the Audit Committee either had inadequate internal controls to comply with Russian excise taxes or failed to have any internal controls to comply with Russian excise taxes.  This failure of internal controls led to a shutdown of the Company's Russian vodka plant in November 2010.  Thus, the Audit Committee failed to have adequate and effective internal controls in place to comply with and pay the Company's excise taxes in Russia.

80.     Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements, lack of internal controls, impairment charges, and Russian excise tax issues.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit

Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

81.    Defendants Carey, Bailey, Fine, Koch, Sieger, Forysiak, and Shanahan, as members of the Board, were required to comply with the Code.  The Code required Carey, Bailey, Fine, Koch, Sieger, Forysiak, and Shanahan to comply with applicable laws and government regulations.  The Director Defendants failed to comply with securities laws.  Despite their knowledge or reckless disregard, the Director Defendants caused these violations of law by allowing improper statements, lack of internal controls, and impairment charges.  Moreover, the Director Defendants failed to require the Company to comply with applicable Russian excise taxes.  Accordingly, the Director Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Director Defendants face a substantial likelihood of liability for their breach of fiduciary duties and violation of the Code so any demand upon them is futile.

82.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by CEDC's officers and directors and these acts are incapable of ratification.

83.    Each of the Defendant directors of CEDC authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

84.    CEDC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CEDC any part of the damages CEDC suffered and will suffer thereby.

85.     If CEDC's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of CEDC. However, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by CEDC against these Defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause CEDC to sue themselves or certain of the officers of CEDC, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors and officers' liability insurance, then the current directors will not cause CEDC to sue the Defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

86.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for CEDC for any of the wrongdoing alleged by Plaintiff herein.

87.     Plaintiff has not made any demand on the shareholders of CEDC to institute this action since such demand would be a futile and useless act for at least the following reasons:

        (a)     CEDC is a publicly held company with over 72.7 million shares outstanding and thousands of shareholders;

        (b)     making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force Plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

<u>COUNT I</u>
**(Against the Individual Defendants for Breach of Fiduciary Duty)**

88.     Plaintiff repeats the allegations contained in the foregoing Paragraphs as if fully set forth herein.

89.     As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of CEDC and because of their ability to control the business and corporate affairs of CEDC, owed CEDC fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage CEDC in a fair, just, honest, and equitable manner.

90.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company had a declining market share in Poland because the Company's new product was cannibalizing its established vodka brands there; (ii) the Company violated Russian excise tax laws which caused its largest Russian production facility to shut down;  (iii) the Russian production facility shutdown was material and would impact the Company's fiscal year; (iv) the Company would need to take an impairment charge due to its declining market share in Poland; (v) that its earnings guidance was improper; and (vi) the Company's internal disclosure and financial controls were ineffective. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

91.     Director Defendants, as directors of the Company, owed CEDC the highest duty of loyalty.  These Defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the earnings guidance, failure to comply with excise tax laws, improper

34

statements regarding the Company's market share, improper impairment charges, and internal disclosure and financial controls.  Defendants Carey, Bailey, Fine, Koch, Sieger, Forysiak, and Shanahan knew or were reckless in not knowing that: (i) the Company had a declining market share in Poland because the Company's new product was cannibalizing its established vodka brands there; (ii) the Company violated Russian excise tax laws which caused its largest Russian production facility to shut down;  (iii) the Russian production facility shutdown was material and would impact the Company's fiscal year; (iv) the Company would need to take an impairment charge due to its declining market share in Poland; (v) that its earnings guidance was improper; and (vi) the Company's internal disclosure and financial controls were ineffective.  Accordingly, Defendants Carey, Bailey, Fine, Koch, Sieger, Forysiak, and Shanahan breached their duty of loyalty to the Company.

92.     The Audit Committee Defendants, Bailey, Forysiak, and Sieger, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and Defendants Bailey, Forysiak, and Sieger failed in their duty to appropriately review financial results, provide earning guidance, and maintain effective internal financial and disclosure controls, as required by the Audit Committee Charter in effect at the time.

93.     Defendant Carey breached his duty of loyalty by selling CEDC stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's shareholders.  The information described above was proprietary, non-public information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which Defendant Carey used for his own benefit when he sold CEDC common stock.

94.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

95.     Plaintiff, on behalf of CEDC, has no adequate remedy at law.

## COUNT II
### (Against All Individual Defendants for Waste of Corporate Assets)

96.     Plaintiff repeats the allegations contained in the foregoing Paragraphs as if fully set forth herein.

97.     As a result of the misconduct described above, the Individual Defendants caused CEDC to incur, and CEDC will continue to incur, significant legal liability and/or legal costs to defend itself as a result of the Individual Defendants' unlawful actions.  Further, the Company wasted corporate assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty threatening the Company's financial health and causing it to incur millions of dollars in legal costs.

98.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

99.     Plaintiff, on behalf of CEDC, has no adequate remedy at law.

## COUNT III
### (Against All Individual Defendants for Unjust Enrichment)

100.    Plaintiff repeats the allegations contained in the foregoing Paragraphs as if fully set forth herein.

101.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CEDC.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to CEDC.

102.    Defendant Carey, sold CEDC stock while in possession of material, adverse non-public information that artificially inflated the price of CEDC stock.  As a result, Defendant Carey profited from his misconduct and was unjustly enriched through their exploitation of material and adverse inside information.

103.    Plaintiff, as a shareholder and representative of CEDC, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

104.    Plaintiff, on behalf of CEDC, has no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing CEDC and the Board to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CEDC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following proposals for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.    a proposal to ensure the establishment, maintenance, and oversight of the Company's financial statements and disclosure control;

2.    a provision to control insider trading;

3.    a provision to permit the shareholders of CEDC to nominate at least three candidates for election to the Board;

4.      a provision to create a Target Market Committee to identify basic business development issues like protecting market share;

5.      a provision to create a committee of the Board to oversee the creation of internal controls to comply with tax laws in all jurisdictions the Company operates; and

6.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff on behalf of CEDC has an effective remedy;

D.      Awarding to CEDC restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

CARELLA, BYRNE, CECCHI,
 OLSTEIN, BRODY & AGNELLO, PC
Attorneys for Plaintiff

By:____/s/ James E. Cecchi_____
        JAMES E. CECCHI

Dated: November 18, 2011

Brian J. Robbins                          William C. Wright
Felipe J. Arroyo                          THE WRIGHT LAW OFFICE, P.A.
Shane P. Sanders                          301 Clematis Street, Suite 3000
Gina Stassi                               West Palm Beach, Florida 33401
ROBBINS UMEDA LLP                         (561) 514-0904
600 B Street, Suite 1900
San Diego, California 92101
(619) 525-3990

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

            CARELLA, BYRNE, CECCHI,
            OLSTEIN, BRODY & AGNELLO, PC
            Attorneys for Plaintiff


By:____/s/ James E. Cecchi_____
        JAMES E. CECCHI

Dated: November 18, 2011

Brian J. Robbins
Felipe J. Arroyo
Shane P. Sanders
Gina Stassi
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, California 92101
(619) 525-3990

William C. Wright
THE WRIGHT LAW OFFICE, P.A.
301 Clematis Street, Suite 3000
West Palm Beach, Florida 33401
(561) 514-0904

<u>VERIFICATION</u>

I, Daniel Himmel, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____11-8-11_____

_____
DANIEL HIMMEL